Argued and submitted January 31, affirmed May 10, 2000

## In the Matter of
## San Seng Saechao, a Minor Child.

## STATE ex rel JUVENILE DEPARTMENT
## OF WASHINGTON COUNTY,
### *Respondent,*

*v.*

## San Seng SAECHAO,
### *Appellant.*

## (07-J950488; CA A102771)

2 P3d 935

Susan D. Isaacs argued the cause and filed the brief for appellant.

Laura S. Anderson, Assistant Attorney General, argued the cause and filed the brief for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

Landau, P. J., concurring in part; dissenting in part.

## BREWER, J.

■     Youth appeals from an order finding him within the jurisdiction of the juvenile court because of acts that, if committed by an adult, would constitute the crimes of riot, assault in the third degree and disorderly conduct. ORS 166.015; ORS 163.165; ORS 166.025. Youth contends that the state failed to prove beyond a reasonable doubt one or more of the elements of each of the charged offenses. We review the juvenile court's orders *de novo*. ORS 419A.200(5); ORS 19.415(3). The juvenile court accepted the version of facts to which the alleged victim testified, we give due deference to the court's credibility determination. *State ex rel Juv. Dept. v. Millican*, 138 Or App 142, 144, 906 P2d 857 (1995), *rev den* 323 Or 114 (1996). We affirm.

    Vinh Huynh attended Century High School in 1997, as did youth and his four cousins, Ou Saechao, San Pu Saechao, Michael Saephanh, and Nay Saephanh. On October 3, Vinh complained to a school official that he was being harassed by other students. As a result, two school vice principals met with Michael that day and told him that such behavior would not be tolerated. Michael told the officials that he was "not responsible for other people." One of the vice principals, Mr. Orme, testified that he met with one of the two Sans, he believed it was youth, about the problem. Later that day, Michael confronted Vinh and accused him of complaining to the official about Michael's conduct. The boys went into the hallway to fight but were stopped by a teacher. After school the same day, Vinh was confronted at his school locker by Michael, youth and the other three cousins. The five cousins came up behind Vinh and were talking to each other in their native language, which Vinh did not understand. The cousins moved in front of Vinh and stood about six or seven feet away from him. A larger group of students also gathered near the scene but stood farther away. San Pu asked Vinh if he wanted to "finish it."

    Vinh knew that something was going to happen, so he dropped his school bag and got ready. San Pu swung at Vinh, so Vinh struck San Pu. Ou then charged Vinh and hit him on the left side while Nay charged from the other side

and began hitting Vinh as well. Vinh tried to run away but his escape was blocked by the locker wall. Nay then kicked Vinh, who fell to the ground. When Nay kicked Vinh, the other cousins, including youth, were "moving everywhere" and Vinh's attention was focused on them. When Vinh got to his feet, a teacher broke up the confrontation. Vinh tried to strike his attackers after the teacher intervened. Youth and his cousins ran from the scene. Vinh did not seek medical attention but suffered a bruised elbow and scratched forehead in the attack.

Because youth was part of the group that surrounded him, Vinh included youth's name on a list of people involved in the incident. Youth did not speak to Vinh during the confrontation and, because Vinh's head was down, Vinh did not know whether youth struck him. The juvenile court found youth, together with the other four cousins, within the court's jurisdiction on each of the charged offenses.[1] Youth appeals from those findings and from the denial of his motion for acquittal on each charge. We turn first to the riot charge.

■     ORS 166.015(1) provides:

"A person commits the crime of riot if while participating with five or more other persons the person engages in tumultuous and violent conduct and thereby intentionally or recklessly creates a grave risk of causing public alarm."

Youth argues that the state failed to prove that he participated in the incident with at least five other people. The state responds that, because Vinh also participated in the altercation, the evidence established the requisite number of participants. We agree with the state.

Because youth's argument presents a question of statutory construction, we first examine the text and context of the riot statute. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993).

"As defined by ORS 166.015, the crime of riot has four elements: A person commits the crime of riot if that person, (1) 'while participating with five or more persons,'

---

[1] We affirmed without opinion the court's adjudication with respect to Michael. *State ex rel Juv. Dept. v. Saephanh*, 164 Or App 175, 991 P2d 64 (1999).

(2) 'engages in tumultuous and violent conduct' and (3) 'thereby intentionally or recklessly' (4) 'creates a grave risk of causing public alarm." *State v. Chakerian*, 325 Or 370, 375, 938 P2d 756 (1997) (footnote omitted).

Our initial focus is on Vinh's involvement in the altercation as it relates to the first statutory element. Although the term "participating with" is not defined by statute, the word "participate" is broadly defined to mean "to take part." *Webster's Third New Int'l Dictionary*, 1646 (unabridged ed 1993). That meaning encompasses interactions among persons who may be acting with different purposes. Athletes and politicians, for example, participate together in sporting events and elections even though they are competitors. Moreover, the fact that Vinh was a reluctant combatant does not mean that he did not participate.[2] The evidence showed that, although he was outnumbered and intimidated, Vinh was actively engaged and not merely passive in the incident. After San Pu attempted to hit him, Vinh may actually have struck the first blow in retaliation. In fact, Vinh had to be restrained from physical retaliation against his attackers after the teacher intervened. Therefore, viewing the word "participating" in isolation, Vinh's involvement would appear to qualify.

The question remains, however, whether the addition of the word "with" narrows the statutory meaning. In common usage, its meaning is broad enough to connote concert of action, adversity, or either. *See Webster's Third New Int'l Dictionary* at 2626. ("With" means both "shar[ing] in an action" and, alternatively, "in opposition to"). The scope of the term "participating with" is, therefore, ambiguous. The ambiguity is even more apparent when the term is construed in context with the other elements of the offense, especially the *mens rea* requirement. Must the other participants, for example, in order to have participated with youth, also have intentionally or recklessly created a grave risk of public alarm? If so, Vinh could not be counted as a participant in this case, because he acted in self-defense. If not, he could be a participant because he actively engaged in the confrontation.

---

[2] The crime of riot does not require identification of an individual victim but, instead, involves a grave risk of *public* alarm. *Chakerian*, 325 Or at 375. Thus, Vinh may have been a participant, for purposes of the riot charge, even though he was the alleged victim of the other charged offenses.

Logical arguments can be made both for and against such a construction of the statute. On the one hand, the last two elements of the offense focus only on the defendant's conduct and state of mind: the defendant must engage in tumultuous and violent conduct and the defendant must act intentionally or recklessly. The statute does not expressly require examination of the conduct and *mens rea* of the other participants. If the legislature had intended that each participant in an incident must act in criminal concert, it could have easily accomplished that result by expressly requiring that the participants must have acted with a common purpose. In other words, the phrasing of the statute suggests that the legislature did not intend to require proof that at least six participants were actually guilty of riot in order to convict one. In that respect, riot appears to be analogous to the crime of racketeering, which does not require that a culpable defendant who *participates* in an enterprise must share with the enterprise a common purpose to engage in criminal conduct. *See* ORS 166.720(3); *State v. Gleason*, 141 Or App 485, 489, 919 P2d 1184, *rev den* 324 Or 323 (1996).

On the other hand, if the remaining participants need not be guilty of riot, what conduct must they participate in? The text and context of the statute do not clearly answer that question. Yet, surely, the other participants must be involved in some way, or else the requirement of their participation would be meaningless. Because the statutory meaning is ambiguous, we resort to legislative history to determine the legislature's intent more accurately. *PGE*, 317 Or at 611-12.

ORS 166.015 was enacted as part of the Oregon Criminal Code of 1971. While drafting the Code, the Criminal Law Revision Commission compiled an accompanying commentary that is part of the legislative history of the Code. *Chakerian*, 325 Or at 379. The commentary for section 218 of the Code, which became ORS 166.015, helps resolve any tension in the statutory text. It provides, in part:

"The common law definition of riot states:

" 'There are five necessary elements in a riot: (1) there must be at least three persons; (2) they must have a common purpose; (3) there must be execution or

inception of the common purpose; (4) there must be an intent to help one another by force if necessary against any person who may oppose them in the execution of their common purpose; (5) there must be force or violence, not merely used in demolishing, but displayed in such a manner as to alarm at least one person of reasonable firmness and courage.' Kenney's Outlines of Criminal Law, § 437 (17th ed 1958).

*"The proposed section adopts the modern concept of a 'riot' by requiring a greater number of rioters and by shifting the emphasis from the commission of some other crime to the 'conduct' that creates a risk of causing 'public alarm.'*

"It must be shown that the rioters were involved in a common disorder; it is not enough to show that numerous individuals were engaged in similar unrelated activities. Mere presence without taking part by word or deed is not participation." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Codes, Final Draft and Report (July 1970), § 208 (emphasis added).

The commentary to the statute, thus, makes reasonably clear that the common-law concept of riot, which *did* require a common purpose and concerted action among the participants, has been modified by statute to require only that the participants be engaged in a common disorder.[3] A common disorder means that the participants must be involved in a related activity but does not require that they act with the same purpose. In this case, Vinh engaged in a violent confrontation with his five antagonists and, therefore, was involved in a common disorder. Viewed in that light, we agree with the state that the evidence established that Vinh participated with the cousins in the melee.[4]

Youth also argues that the state did not prove that he was a participant or that he engaged in tumultuous and

---

[3] The trend away from the common-law requirement of concerted action is reflected in the development of the law in other states as well. *See, e.g., People v. Martinez*, 705 P2d 9, 11 (Colo App 1985) (riot requires only an assemblage of persons and not a concert of action or a common purpose).

[4] The petition in this case did not allege that Vinh was a participant in the riot but merely identified youth and his four cousins as participants. Youth does not assign error to that variance, nor does he contend that, as a result, he has been misled or exposed to any risk of being charged twice for the same offense. *State v. Delaney*, 160 Or App 559, 563-64, 984 P2d 282, *rev den* 329 Or 358 (1999).

violent conduct. He correctly notes that "mere presence without taking part by word or deed is not participation" sufficient to create criminal responsibility for riot. *State v. Goodwill*, 35 Or App 293, 297, 581 P2d 113 (1978), *rev den* 285 Or 1 (1979). In order to support a conviction for riot, the state must prove that the "person charged actually engaged in violent and tumultuous conduct." *Chakerian*, 325 Or at 375 n 8. Youth points to the absence of any evidence that he struck Vinh or verbally encouraged the attack. He maintains that, at most, the evidence showed that he was one of five youths "standing near [Vinh], confronting and intimidating him."

In finding that youth committed riot, the juvenile court explained:

"As a consequence that follows, all five of the people who have been identified in the pleadings moved in concert. It wasn't happenstance, but an outgrowth of the confrontation between [Michael] and the victim which occurred specifically earlier in the day and which apparently was bad blood for some time.

"All five of the identified people surrounded the victim in a confrontational manner, specifically the state's exhibit, which is the diagram of the scene at location Y that occurred. During the period of time, the victim's ability to leave was limited by the presence of all five youths. His ability to obtain assistance from other passersby was limited by the manner in which the five youths positioned themselves. Commonsensically the situation was threatening and intimidating."

We agree with the juvenile court's view of the evidence. Youth and his cousins jointly confronted Vinh in the culmination of longstanding mutual dislike. Youth, with his cousins, surrounded Vinh, blocking his escape. One of the cousins challenged Vinh to fight. Just before the physical attack began, youth and his cousins were talking to each other in a language Vinh did not understand. Vinh was intimidated and expected violence from the cousins. After the cousins spoke and the attack began, youth and the other cousins were "moving everywhere," and Vinh's attention was diverted to them when Nay kicked him to the ground.

■ In *Chakerian*, the Supreme Court began the process of defining the term "tumultuous and violent conduct" in ORS 166.015 by resorting to the ordinary meanings of its words. 325 Or at 377. Using *Webster's Third New Int'l Dictionary*, the court set out the definition of "tumultuous" as:

"1: marked by tumult: full of commotion and uproar: riotous, stormy, boisterous * * * 2: tending or disposed to cause or incite a tumult * * * 3: marked by violent or overwhelming turbulence or upheaval." *Id.* at 2462.

The court next defined "violent" as:

"1. characterized by extreme force * * *: marked by abnormally sudden physical activity and intensity * * * 2: furious or vehement to the point of being improper, unjust or illegal * * * 3: extremely or intensely vivid or loud * * *: unusually intense * * *: unnaturally strong * * * 4: produced or effected by force: unnatural * * * 5: tending to distort or misrepresent * * * 6: extremely excited: emotionally aroused [.]" *Id.* at 2554.

And finally it defined "conduct" as "behavior in a specific situation or in relation or on a specific occasion." *Id.* The court distilled the meaning of the term as follows:

"Giving the statute a fair reading in the light of the common definitions of the terms of 'tumultuous,' 'violent,' and 'conduct,' *we conclude that the statute refers to physical activity that reasonably is perceived by others as threatening an imminent breach of the peace.*" *Chakerian*, 325 Or at 378 (emphasis added).

In the dissent's view, youth's conduct did not satisfy the ordinary meaning of "tumultuous and violent conduct." The dissent parses youth's conduct into separate and discrete acts, unrelated to each other and unrelated to the simultaneous activity of the other participants. With respect, that perspective is inconsistent with *Chakerian* and with previous decisions of this court. Unlike the dissent, the Supreme Court understood the statutory phrase to convey more than the mere array of dictionary definitions of its component words. The question is whether youth's conduct, viewed as a whole, constituted "physical activity that [was] reasonably perceived by others as threatening an imminent breach of the

peace." That test is consistent with prior decisions of this court holding that violent and tumultuous conduct can consist of interference with a victim's escape or obstruction of persons who might assist the victim. *See State v. Hicks*, 120 Or App 345, 348, 852 P2d 894, *rev den* 317 Or 584 (1993); *State v. Chavez*, 65 Or App 534, 537, 671 P2d 708 (1983), *rev den* 296 Or 253 (1984). There is certainly nothing within the meaning of the statute that requires that a participant have physical contact with any other person.

■ Admittedly, this is a close case. The altercation lasted only a short time before it was broken up and youth's participation was more limited than the involvement of some of his cousins. However, youth's "conduct" must be viewed in "relation" to the "specific situation," not as abstract behavior, unconnected to the activities of his co-participants. Youth's conduct was tumultuous within the ordinary meaning approved in *Chakerian,* because he engaged in concerted activity that was "full of commotion and uproar."[5] It is also fair to say that youth's conduct was violent, because it was characterized by "abnormally sudden physical activity and intensity." In sum, youth's conduct would be reasonably viewed as threatening the imminent breach of the peace that, in fact, ensued. Viewing the evidence as a whole, including youth's behavior in the context of the group's activity, we agree with the juvenile court that youth engaged in tumultuous and violent conduct.

■ We turn briefly to the final element of the crime of riot, the requirement that grave public alarm be created recklessly. Youth notes that some students who witnessed the attack were not alarmed by the incident. Although that may be the case, it is beside the point. Youth's conduct recklessly created a grave risk of public alarm because the attack against Vinh took place in a crowded school hallway. It risked a greater melee, injury to noncombatants, and the natural alarm flowing from both risks. Therefore, the court did not err in finding youth within its jurisdiction on the riot charge.

---

[5] "Commotion" means, among other ordinary meanings, "continuous or recurrent motion." *Webster's Third New Int'l Dictionary* at 459. "Uproar" means, among other things "a state of commotion or excitement." *Id.* at 2518.

■ Youth next challenges the juvenile court's finding that he committed assault in the third degree. The state's theory was that youth aided and abetted the cousins, who intentionally or knowingly caused physical injury to Vinh. ORS 163.165(1); ORS 161.155(2)(b). The state argues, and we accept, that the least degree of concert or collusion among the parties to an illegal transaction suffices to inculpate all. *State ex rel Juv. Dept. v. Holloway*, 102 Or App 553, 557, 795 P2d 589 (1990). Here, youth helped seal off Vinh's escape and to distract his attention while others struck him. That conduct is sufficient to allow us to infer beyond a reasonable doubt that youth aided and abetted the assault.

■ Finally, youth argues that he did not engage in disorderly conduct. ORS 166.025 provides, in part:

> "(1)   A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or *recklessly creating a risk thereof*, the person:

> "(a)   *Engages in* fighting or violent, *tumultuous* or threatening behavior[.]" (Emphasis added.)

Youth relies solely on his arguments relating to the other charges discussed above. For the same reasons, we reject those arguments once again. Youth engaged in tumultuous behavior that recklessly created a risk of public alarm, and, therefore, youth engaged in disorderly conduct.

Affirmed.

**LANDAU, P. J.,** concurring in part; dissenting in part.

The majority holds that, on *de novo* review, the evidence establishes beyond a reasonable doubt that youth committed the crimes of riot, assault in the third degree, and disorderly conduct. I agree with the majority that the evidence establishes that youth aided and abetted the assault. But I strongly disagree with the majority that the evidence establishes that youth committed either riot or disorderly conduct. I therefore dissent from the majority's contrary conclusions as to those crimes.

I begin with the sufficiency of the evidence as to the crime of riot. ORS 166.015(1) provides:

"A person commits the crime of riot if while participating with five or more other persons the person engages in *tumultuous and violent conduct* and thereby intentionally or recklessly creates a grave risk of causing public alarm."

(Emphasis added.) At issue in this case is whether youth engaged in "tumultuous and violent conduct" during his confrontation with Vinh. The majority holds:

"Youth, with his cousins, surrounded Vinh, blocking his escape. One of the cousins challenged Vinh to fight. Just before the physical attack began, youth and his cousins were talking to each other in a language Vinh did not understand. Vinh was intimidated and expected violence from the cousins. After the cousins spoke and the attack began, youth and the other cousins were 'moving everywhere,' and Vinh's attention was diverted to them when Nay [one of the cousins] kicked him to the ground."

167 Or App at 234. Thus, the majority holds that youth engaged in three acts that constituted "tumultuous and violent conduct," namely, (1) youth was a member of a group that "surrounded Vinh"; (2) youth spoke to other members of the group in a language that Vinh did not understand; and (3) youth and the group "moved everywhere" in a way that distracted Vinh. The majority, however, never explains why those three acts constitute "tumultuous and violent conduct."

In my view, the proper method of analysis is first to define the relevant terms and then to examine the evidence in light of the relevant definitions. ORS 166.015 does not define the phrase "tumultuous and violent conduct." But in *State v. Chakerian*, 325 Or 370, 938 P2d 756 (1997), the Supreme Court did. In that case, the defendant challenged the constitutionality of ORS 166.015. He argued that, based on the Criminal Law Revision Commission's commentary concerning ORS 166.015, the statute was intended to proscribe making "ominous threats" of personal injury and property damage. According to the defendant, a statute that targets the making of threats violates the guarantee of free expression of Article I, section 8, of the Oregon Constitution.

The court first determined whether ORS 166.015 proscribes the making of threats. Applying the familiar methodology of *PGE v. Bureau of Labor and Industries*, 317

Or 606, 610-12, 859 P2d 1143 (1993), the court began with the text, to determine whether it contains an unambiguous answer. The court concluded that it does:

> "The text of ORS 166.015 prohibits persons from engaging in 'tumultuous and violent conduct.' These are words of common usage, to which we typically ascribe their ordinary meaning. * * * 'Tumultuous' is defined as:
>
>> " '1: marked by tumult: full of commotion and uproar: riotous, stormy, boisterous * * * 2: tending or disposed to cause or incite a tumult * * * 3: marked by violent or overwhelming turbulence or upheaval.'
>
> "*Webster's Third New Int'l Dictionary*, 2462 (unabridged 1993). The definition of 'violent' is:
>
>> " '1: characterized by extreme force * * *: marked by abnormally sudden physical activity and intensity * * * 2: furious or vehement to the point of being improper, unjust, or illegal * * * 3: extremely or intensely vivid or loud * * *: unusually intense * * *: unnaturally strong * * * 4: produced or effected by force: unnatural * * * 5: tending to distort or misrepresent * * * 6: extremely excited: emotionally aroused[.]'
>
> "*Id.* at 2554. Finally, 'conduct' is defined as 'behavior in a particular situation or relation or on a specific occasion.' *Id.* at 474."

*Chakerian*, 325 Or at 377.

As for the commentary of the Criminal Law Commission, the court held that it constitutes legislative history. Because the statutory phrase "tumultuous and violent conduct" is unambiguous, the court held that it is not appropriate to consider the commentary as a basis for asserting that the term includes "ominous threats." *Id.* at 377-78. Ultimately, the court concluded that, on the basis of the foregoing definitions of the statutory terms, "[t]he legislature did not intend to reach protected expression in prohibiting 'tumultuous and violent conduct.' " *Id.* at 380.

Thus, the question in this case is whether the three acts that the majority says youth committed constitute "tumultuous and violent conduct," as the court defined the terms in *Chakerian*. In addressing that question, it bears

emphasis that the statute is phrased in the conjunctive; both "tumultuous" *and* "violent" conduct is required.

The first act is that youth was a member of a group that "surrounded Vinh," which had the effect of blocking his escape. I do not understand how simply being a member of a group that "surrounded" another individual constitutes a "tumultuous" and "violent" act. Nothing in the record suggests that, in "surrounding" Vinh, youth made any unusual noise or other commotion. Likewise, nothing in the record suggests that any force was involved, that any "sudden physical activity and intensity" was involved, that, in surrounding Vinh, youth or his cousins were "extremely or intensely vivid or loud" or that their actions in surrounding Vinh met any of the other definitional components of the relevant statutory terms.

The second act is that youth and his cousins conversed in Mien, which Vinh, who is Vietnamese, did not understand. I am at a loss to understand how conversing in a language that was unfamiliar to Vinh constituted "tumultuous and violent conduct." Indeed, after *Chakerian*, I do not understand how the conversation even is relevant.

The third act is that youth made an undefined movement that distracted Vinh as he was attacked by the other members of the group. Once again, nothing in the record specifies what sort of "movement" youth engaged in, much less that it was "riotous, stormy, boisterous" or "marked by violent or overwhelming turbulence or upheaval." Likewise, nothing in the record remotely suggests that what youth did involved "extreme force," or that his movement was "furious or vehement," "extremely or intensely vivid or loud," or any of the other definitional components of the statutory terms. There is thus a complete absence of evidence that youth's conduct was "tumultuous and violent."

The majority responds first by arguing that *Chakerian* really does not stand for the proposition that the phrase "tumultuous and violent" means what the words ordinarily mean. According to the majority, the court in *Chakerian* backed away from the ordinary definition of the terms when it "distilled" them to merely " 'physical activity that [was] reasonably perceived by others as threatening an imminent

breach of the peace.' " 167 Or App at 235 (quoting *Chakerian*, 325 Or at 378). The majority, however, takes the court's statement out of context. The court made it in response to the defendant's argument that the statute proscribed the making of threats. In that context, the court responded that, given the dictionary definitions of the relevant terms, the statute refers to *physical activity*. The court did not say, as the majority suggests, that *any* activity that threatens an imminent breach of the peace qualifies, whether or not it is "tumultuous and violent." Even assuming that the majority's reading of *Chakerian* is correct, however, its opinion still fails to explain how the evidence shows beyond a reasonable doubt that youth threatened an imminent breach of the peace by engaging in the three acts that the majority finds he committed.

The majority next argues that, in any event, youth's conduct was tumultuous, "because he engaged in concerted activity that was 'full of commotion and uproar.' " 167 Or App at 236 (quoting *Chakerian*, 325 Or at 377). That *ipsedixitism* is unsupported by any reference to the record. There is absolutely no testimony as to the character of youth's conduct beyond the fact that he blocked Vinh's exit, that he spoke to his cousins in Mien, and that he moved in an undescribed way that distracted Vinh. I challenge the majority to point to any portion of the record that reveals the nature of *youth's* conduct to have been "full of commotion and uproar."

Similarly, the majority declares that "it is also fair to say that youth's conduct was violent, because it was characterized by 'abnormally sudden physical activity and intensity.' " Once again, however, the majority makes no reference to the record of this case as it pertains to *youth's* conduct. There is a complete absence of testimony about the nature of youth's movements, much less testimony that they were "abnormally sudden" or "intense."

The majority simply reasons that youth's actions must be viewed "in the context of the group's activity." 167 Or App at 236. According to the majority, even if the record does not show the nature of youth's actions, it may be inferred from the fact that he was part of a larger group whose other members did engage in riotous conduct. The problem with the majority's approach to the evidence is that it is contrary

to the Supreme Court's cautionary instruction in *Chakerian*, that there must be evidence that youth—and not merely other members of the group of which he was a part—actually engaged in "tumultuous and violent conduct." In the court's words:

> "It is clear under the statute that a person does not commit the crime of riot if he or she merely is part of a group and five *other* members of that group engage in tumultuous and violent conduct that intentionally or recklessly creates a grave risk of causing public alarm. *Under the statute, the state must prove that the person charged actually 'engage[d] in violent and tumultuous conduct.'*"

*Chakerian*, 325 Or at 375 n 8 (emphasis added). Thus, although certainly youth's conduct must be seen in context, the fact remains that it is his conduct alone that is at issue, not his cousins'.

The majority insists that "violent and tumultuous conduct can consist of interference with a victim's escape or obstruction of persons who might assist the victim." 167 Or App at 236. Cited as authority for that proposition are two earlier decisions of this court, *State v. Hicks*, 120 Or App 345, 852 P2d 894, *rev den* 317 Or 584 (1993), and *State v. Chavez*, 65 Or App 534, 671 P2d 708 (1983), *rev den* 296 Or 253 (1984).

In *Hicks*, the defendant not only was a member of a group that surrounded the victim but also was an active participant in beating the victim. The opinion does say that, in "cheering on the attack" and "surrounding the victim," the other members of the group also were guilty of riot. 120 Or App at 348. In reaching that conclusion, however, the court expressly relied on—indeed, emphasized—the portions of the Criminal Law Revision Commission commentary that referred to "ominous threats." *Id.* at 347. Plainly, neither the court's conclusion nor its reasoning can be squared with what the Supreme Court later said in *Chakerian*. Even the state recognizes in this case that *Hicks* conflicts with *Chakerian*.

*Chavez* similarly involved a defendant who did not merely stand at the scene with other members of a group, but actively participated in the beating of the victim. Again, the court said that several other members of the group who had

merely stood at the scene to prevent anyone from assisting defendant also committed riot. But, as with *Hicks*, that portion of the decision cannot be reconciled with *Chakerian*.

In short, there is no evidence to support a conclusion that youth engaged in "tumultuous and violent conduct." In consequence, there is no evidence that he committed the crime of riot, and the majority errs in reaching a contrary conclusion.

I turn then to the sufficiency of the evidence as to the crime of disorderly conduct. ORS 166.025 provides, in part:

"(1)   A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:

"(a)   Engages in fighting or in violent, tumultuous or threatening behavior[.]"

The majority concludes that "[y]outh engaged in tumultuous behavior that recklessly created a risk of public alarm and, therefore, youth engaged in disorderly conduct." 167 Or App at 237. Once again, the majority's opinion neglects to consider the meaning of the term "tumultuous." Nothing in the record of this case demonstrates, or even suggests, that youth engaged in tumultuous conduct, as that term is ordinarily used and as it has been defined by the Supreme Court. The majority therefore errs in concluding that the evidence demonstrates that youth committed the crime of disorderly conduct.